# FOR PUBLICATION

**FILED & ENTERED**

**JUN 19 2015**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Gonzalez DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>Diana Lopez<br><br><br><br>        Debtor(s). | CHAPTER 7<br><br>Case No.:  1:11-bk-16307-MT<br><br>Adv No:   1:12-ap-01097-MT |
| David Seror<br><br>        Plaintiff(s),<br><br>   v.<br><br>Diana Lopez<br><br>        Defendant(s). | **FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL RE CHAPTER 7 TRUSTEE'S COMPLAINT OBJECTING TO DEBTOR'S DISCHARGE UNDER 11 U.S.C. § 727 (A)**<br><br>Trial Dates:  November 7 and 10, 2014<br>Time:            9:00 a.m.<br>Courtroom:   302 |

     In this adversary proceeding, the Chapter 7 Trustee, David Seror (the "Trustee") objects to the discharge of debtor Diana Lopez ("Lopez") under a number of provisions of 11 U.S.C. § 727 (a).[1]

///

---

[1] This court has jurisdiction pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157. This action is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (C), and (I).

## I.    BACKGROUND

On May 20, 2011, an involuntary chapter 7 petition was filed by petitioning creditors, Miguel Ortega, Martha Gomez, and Richard Pena in the name of Diana Lopez. See Case no. 1:11-bk-16307-MT ("Lopez Bankr."). On July 20, 2011, Lopez filed an answer wherein she stated that she did not oppose the entry of an order for relief. See Answer to Complaint, Lopez Bankr. ECF Doc. 10. An order for relief was entered on July 28, 2011. See Lopez Bankr. ECF Doc. 12. On October 31, 2011, the same petitioning creditors filed a second involuntary chapter 7 petition in the name of L.D.T. Investments, Inc.  ("LDT"). See Case no. 1:11-bk-22664-MT ("LDT Bankr."). An order for relief was entered on December 8, 2011. See LDT Bankr. ECF Doc. 11. David Seror is the Chapter 7 Trustee appointed in both cases.

Lopez is the sole equity holder of LDT. On August 25, 2011, the California Department Real Estate issued an Order to Desist and Refrain against LDT (the "DRE Order"). The DRE Order found that LDT and Lopez violated various provisions of the Financial Code and the Business and Professions Code. Subsequently, on September 16, 2011, a Decision and Default Order was filed from the Department of Real Estate State of California stating that LDT's real estate license was revoked. Lopez was named in the caption and an order issued for her to desist and refrain from performing any activity that requires a real estate license. See Defendant Ex. 8 at 24-33 of 81.

Prior to Lopez's first §341(a) meeting of creditors in her personal bankruptcy on August 2, 2011, Lopez filed her schedule of assets and liabilities ("Original Schedules") and statement of financial affairs ("SOFA") and asserted her Fifth Amendment privilege against self-incrimination on key questions in her SOFA. Lopez invoked her privilege with respect to:

- Item No. 1, which asked the Debtor to provide information regarding "Income from employment or operation of business" in 2009 and 2010;
- Item No. 2, which asked the Debtor to provide information regarding "Income other than from employment or operation of business"; and
- Item No. 8, which asked the Debtor to provide information regarding " . . . all losses from fire, theft, other casualty or gambling within one year immediately preceding commencement of this case . . . ."

The initial §341(a) meeting in the personal case was held on September 22, 2011 ("§341(a) Meeting"). At the §341(a) Meeting, the Trustee questioned the Debtor regarding the following topics, to which the Debtor invoked her Fifth Amendment privilege not to testify:

- a.    The production of the Debtor's tax returns;
- b.    The type of business LDT was in;
- c.    The real property that LDT owned in the four years preceding the petition date;
- d.    The amount of loans made by LDT in the year preceding the Petition Date;
- e.    Whether and to what extent Debtor had personally signed guarantees for loans made to LDT by various entities listed on Debtor's Schedule F as unsecured creditors;
- f.    The mere location of LDT's corporate records;
- g.    The nature and extent of Debtor's claims against Benito Rodriguez (an asset scheduled on Debtor's Schedule B);

-2-

h.  The source of funds relating to a gambling debt listed on Schedule F for $60,000 concerning the Palms Casino

The Trustee testified at trial that the §341(a) meeting of creditors is an important opportunity for him to ask questions, to figure out various transfers and to understand documents provided by the debtor.  A complete SOFA allows a trustee to tell what secured debt there is, what income might be available, what transfers have been made pre-petition, and what the larger picture of the debtor's financial affairs is.  He usually compares the tax returns provided by the debtor to the SOFA.  In Lopez's individual case, her refusal to testify and provide a lot of information, combined with a failure to turn over tax returns made it very frustrating and difficult to administer the case.

After the initial 341(a) meeting, on October 6, 2011, Lopez filed Amended Schedules and an Amended SOFA, in which Lopez again invoked her Fifth Amendment privilege on three questions, Items No. 1, 2, and 8 in the amended SOFA.  The 341(a) meeting in the Lopez case was concluded on the morning of October 26, 2011. After the 341(a) meeting was officially concluded, Lopez finally provided a copy of her 2010 personal tax returns to the Trustee and informed him that she was no longer asserting her Fifth Amendment privilege with respect to the 2010 return. See Trustee Ex 59. The following day, Lopez withdrew any claim of privilege as to her 2009 tax return and sent a copy to the Trustee. See Trustee Ex. 60.

On February 7, 2012, in connection with LDT's involuntary bankruptcy case, counsel for the Trustee requested that Lopez, as the 100% shareholder, CEO, and sole officer of LDT, turn over all books and records in her possession, custody, and control regarding LDT (the "Demand Letter").  In response to the Demand Letter, on February 10, 2012, former counsel for Lopez responded to the Trustee, stating that Lopez would preserve all of LDT's books and records then in her possession, custody, and control, and that she would produce the same to the Trustee. Lopez's counsel stated, however, that LDT had "sold" all of its electronic equipment, including computers and hard drives at a garage sale (the "Garage Sale"), and Lopez therefore could not produce them.

On February 14, 2012, former counsel for Lopez wrote to the Trustee, informing him that Lopez needed to make copies of the LDT documents, but she believed she could deliver them by February 29, 2012.  On February 29, 2012, Lopez produced two banker's boxes, containing a total of eleven folders. The Trustee declined to pay for the copying of the LDT records.

On March 19, 2012, the Trustee commenced this adversary proceeding against Lopez seeking a denial of discharge under § 727 of the Bankruptcy Code. See Case no. 1:12-ap-01097-MT (the "Adversary").

Lopez then began the long process of copying additional LDT records herself and providing them in bits and pieces to the Trustee from March 20, 2012 until November 30, 2012. See Trustee Ex. 57 at SDL0346-0399.  On June 12, 2012, after Lopez had produced 16 boxes of documents to the Trustee, the Trustee reached a stipulation for Lopez's voluntary appearance to testify and finish turning over LDT documents and then sought an order under F.R.B.P. 2004 for numerous other entities to produce records and testimony. See LDT Bankr. ECF Doc. 61. Two weeks later, Lopez and the Trustee filed a stipulation wherein Lopez promised to use her best efforts to finally complete her lengthy copying effort by July 30 and to be deposed on August 28,

2012. See LDT Bankr. ECF Doc. 68. On September 24, 2012, the Trustee filed a motion to compel LDT to: (a) file statements and schedules and a creditor matrix, (b) turn over books, records, and property of the estate, and (c) cooperate with the Trustee. See LDT Bankr. ECF Doc. 97. Although the Trustee's motion to compel was granted, (LDT Bankr. ECF Doc. 141 and 163), no such items were ever filed on behalf of LDT.

On March 19, 2013, the Court entered a Memorandum of Decision and Order on the Trustee's Motion to Compel LDT to (1) File Statements and Schedules and Cooperate with the Trustee (LDT Bankr. ECF No. 97), in which the Court ordered Diana Lopez to: (1) immediately turn over all books, records, and property of LDT to the Trustee, (2) turn over all computer files of LDT that were still in her possession, (3) turn over any rents collected following the Order for Relief by Lopez, Precious Gems Management, Inc., or Lopez's daughters as to properties owned by LDT; and (4) cease from engaging in any post-petition action that otherwise require Court or Trustee approval, regardless of whether Lopez was acting on behalf of herself or LDT. ("2013 Memo of Decision"). See LDT Bankr. ECF No. 184.

Lopez, as the sole shareholder, Chief Executive Officer, and sole corporate officer of LDT, has never filed schedules in the LDT bankruptcy case. Debtor did eventually produce approximately seventy cartons of copied LDT books and records. Lopez also hired CPA Ilma Avila ("Avila") sometime in 2013 to do an "Accountant's Compilation Report" of her finances and spent 22 hours with her reviewing personal and LDT records.

On May 28, 2013, Lopez filed a second amended SOFA in her personal case. The Second Amended SOFA removed any invocation of the Fifth Amendment privilege. Lopez answered all questions in that SOFA regarding income from LDT in 2009 and 2010; income from other sources including her gambling winnings; and disclosed her losses. Lopez's answers differed from her original and first amended SOFA.

As of January 7, 2014, Lopez represented herself following the withdrawal of her attorney of record. On January 17, 2014, Lopez filed a Motion for Summary Judgment which was denied. The Court then held a two day trial on November 7 and 10, 2014. The Trustee pursued only the causes of actions listed below; all others in the complaint were abandoned.

The Trustee alleged three causes of action under the Bankruptcy Code with respect to Lopez' personal bankruptcy:

**§ 727(a)(3):** that Lopez concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information from which Lopez's financial condition or business transactions might be ascertained;

**§ 727(a)(4)(D):** that Lopez knowingly and fraudulently, in or in connection with the case withheld from the Trustee any recorded information relating to Lopez's property or financial affairs;

**§ 727(a)(5):** that Lopez failed to explain satisfactorily any loss of assets or deficiency of assets to meet Lopez's liabilities.

In addition, the Trustee alleged four violations under §727(a)(7) with respect to Lopez's activity as an officer of the LDT Investments bankruptcy, which prohibits certain actions in connection with another case concerning an insider of Lopez (i.e., LDT) as follows:

**§ 727(a)(2):** that Lopez, with intent to hinder, delay, or defraud a creditor or an officer of the LDT estate has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of LDT within one year of the petition date, or property of the LDT Bankruptcy estate post-petition;

**§ 727(a)(3):** that Lopez concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information from which LDT's financial condition or business transactions might be ascertained;

**§ 727(a)(4)(D):** that Lopez knowingly and fraudulently, in or in connection with the LDT case withheld from the Trustee any recorded information relating to LDT's property or financial affairs;

**§ 727(a)(5):** that Lopez failed to explain satisfactorily any loss of assets or deficiency of assets to meet LDT's liabilities.

## II.   EVIDENTIARY RULINGS

At the hearing, the Trustee requested the Court take judicial notice of Lopez's Schedule of Assets and Liabilities and SOFA; Lopez's amended Schedules of Assets and Liabilities and SOFA (Trustee Ex. 1); Memorandum of Decision entered on January 29, 2013 (Trustee Ex. 2); an Order on Chapter 7 Trustee's Motion to Compel (Trustee Ex. 7); Lopez's Second Amended SOFA filed May 28, 2013(Trustee Ex. 9); and various Los Angeles Superior Court documents: including Unlawful Detainer Complaints, 3-Day Notices to Pay Rent or Quit and 60-day Notice to Terminate Tenancy (Trustee Ex. 36-53 "UD proceeding documents").

The Court overruled Lopez's objection to this request. Federal Rule of Evidence 201[2] permits judicial notice because they are court documents and the accuracy of the documents have not been questioned. Further, the earlier decision is settled law of the case. These exhibits were also admitted under Fed. R. Evid. 801(d). "Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions." In re Bohrer, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001); see also In re Haun, 396 B.R. 522, 530 n.16 (Bankr. D. Idaho 2008) ("The submissions in [the underlying bankruptcy case] made by Defendant under penalty of perjury, such as in his sworn schedules and statement of financial affairs may be treated as evidentiary admissions under Fed. R. Evid. 801(d).").

The following witnesses testified at trial: Diana Lopez, Debtor; David Seror, Chapter 7 Trustee; John Menchaca, a rebuttal witness called to testify as to the sufficiency of the expert report of Certified Public Account Ilma Avila; Kathleen March, former counsel for Debtor; Ilma

---

[2] Federal Rule of Evidence 201 provides that "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Avila, Certified Public Accountant, Debtor's expert. Lopez had planned to call numerous other witnesses, and subpoenas were issued for them, (Adv. ECF Doc. 97), but Lopez ultimately decided not to call these witnesses.

Lopez represented herself at trial, although she was represented by counsel in her personal bankruptcy case for the first 21 months of this adversary case, and appears to be still represented in the bankruptcy case. See Lopez Bankr. ECF No. 14-1 at 22-23; and Adv. ECF Doc. 58. The Court granted numerous continuances of the pretrial conference in order to allow Lopez an opportunity to provide a list of facts she wished to prove at trial and to respond the proffered pretrial stipulation drafted by the Trustee. The Court repeatedly emphasized the need to gather all exhibits and prepare them for trial. At trial, Lopez was given as long as she wanted to testify.

At the completion of the two day trial, the following exhibits were admitted into evidence:

| Ex. # | Trustee's Exhibits: | Ex. # | Defendant's Exhibits: |
|---|---|---|---|
| 1 | Lopez's schedule of assets and liabilities and SOFA | 5 | IRS Proof of Claim #6 in Lopez Bankr. |
| 2 | Lopez's AMENDED schedule of assets and liabilities and SOFA | 6 | Declaration and Report of CPA Expert Witness Ilma Avila |
| 7 | Memorandum of Decision | 8 | LDT Documents and Correspondence with the Department of Real Estate |
| 8 | Order on Chapter 7 Trustee's Motion to Compel – | 11 | LDT Insurance Claims and Denials |
| 9 | Lopez's 2nd AMENDED schedule of assets and liabilities and SOFA | 12 | LDT Records and Related Financial Documents – 628 pages |
| 36-53 | Unlawful Detainer proceeding documents | 16 | 2010 Payroll Checks and Cash Deposited by Diana Lopez |
| 54 | Expert Rebuttal Report by John Menchaca | 19 | Index of LDT documents produced and delivered to the Trustee |
| 55 | Deposition Transcript of Diana Lopez | 22 | Proof of Payments to IRS and Lenders after LDT Suspension |
| 57 | Exhibits to the Depositions of Diana Lopez and Ilma Avila | 31 | Income Tax Examination Revised Report by the IRS |
| 58 | Letter from Debtor's Former Counsel to Trustee re amounts borrowed by Lopez from persons listed in Schedule E. | | |
| 59 | Letter from Debtor's Former Counsel to Trustee re waiver of 5th Am. Privilege to 2010 Tax return | | |
| 60 | Letter  from Debtor's Former Counsel to Trustee re waiver of 5th Am. Privilege to 2009 Tax return | | |

1

2

The parties filed a written stipulation as to some of the facts of this case. <u>See</u> Adv. ECF No. 89. The Court hereby adopts the stipulated facts as findings of fact and discusses them along with any other trial evidence as part of the findings of fact and conclusions of law.

3

4

### III.    CAUSES OF ACTION

5

6

7

8

In general, the bankruptcy court must grant a discharge to an individual chapter 7 debtor unless one of the twelve enumerated grounds in § 727(a) is satisfied. In the spirit of the "fresh start" principles that the Bankruptcy Code embodies, claims for denial of discharge are liberally construed in favor of the debtor and against the objector to discharge. <u>Khalil v. Developers Sur. & Indem. Co.</u> (<u>In re Khalil</u>), 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007) aff'd, 578 F.3d 1167 (9th Cir. 2009). The objector to discharge bears the burden to prove by a preponderance of evidence that the debtor's discharge should be denied under an enumerated ground of § 727(a). <u>Id.</u>

9

**a)    § 727(a)(3) - Failure to Keep or Preserve Records:**

10

11

12

13

14

15

16

17

18

19

Section 727(a)(3) provides for denial of a debtor's discharge if the debtor "has concealed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3).  The [Debtor] must present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past. <u>In re Cox</u>, 904 F.2d 1399, 1400 (9th Cir. 1990). In some cases, a failure to produce proper records will not justify a denial of discharge when the missing information can be reconstructed from records kept by others. <u>See</u> Collier on Bankruptcy, ¶ 727.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed). To determine whether the failure was justified under the circumstances, the court should consider, among other factors it deems relevant, (1) Debtor's intelligence and educational background; (2) experience in business matters; (3) the extent of involvement in the businesses for which discharge is sought; (4) Debtors reliance, including her knowledge of whether records were being kept; (5) the nature of the marital relationship; and (6) any recordkeeping or inquiry duties imposed upon Debtor by state law. <u>In re Cox</u>, 904 F.2d 1399, 1403 n.5 (9th Cir. 1990).

20

**b)    § 727(a)(4)(D) - Withholding Records:**

21

22

23

24

25

26

Section 727(a)(4)(D) provides that a discharge shall be denied to a debtor who "knowingly and fraudulently, in or in connection with the case withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers relating to the debtor's property or financial affairs." The purpose of § 727(a)(4) is to ensure that a debtor provides reliable information so interested parties do not have to dig out the facts in examination or investigations. <u>Hansen v. Moore (In re Hansen)</u>, 368 B.R. 868, 872 (B.A.P. 9th Cir. 2007). Intent under § 727(a)(4) may be established by circumstantial evidence, or by inferences drawn from a course of conduct. <u>Id.</u>

27

**c)    § 727(a)(5) - Explaining Loss of Assets:**

28

Under 11 U.S.C §727(a)(5), a debtor may not be granted a discharge if the debtor has

failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities. Section 727(a)(5) is broadly drawn and gives the bankruptcy court power to decline to grant a discharge in bankruptcy when the debtor does not adequately explain a shortage, loss, or disappearance of assets." Aoki v. Atto Corp. (In re Aoki), 323 B.R. 803, 817 (B.A.P. 1st Cir. 2005). Vague, indefinite, and uncorroborated explanations are unsatisfactory. Bell v. Stuerke (In re Stuerke), 61 B.R. 623, 626 (B.A.P. 9th Cir. 1986); Aoki, 323 B.R. at 817.

Under § 727(a)(5) an objecting party bears the initial burden of proof and must demonstrate: (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets. Retz v. Samson (In re Retz), 606 F.3d 1189, 1193 (9th Cir. 2010). "A petitioner cannot omit items from his schedules, force the trustee and the creditors, at their peril, to guess that he has done so--and hold them to a mythical requirement that they search through a paperwork jungle in the hope of finding an overlooked needle in a documentary haystack." Id. at 1206 citing In re Tully, 818 F.2d 106, 108 (1st Cir. 1987).

**d)   § 727(a)(7) - Actions Taken in Related Case:**

Section 727(a)(7) denies a discharge to a debtor who:

> (1) on or within one year before the date of the filing of the petition[3], or at any time during the debtor's own case,
> (2) commits any of the objectionable acts specified in subsection 727(a)(2), (3), (4), (5) or (6),
> (3) in connection with another case concerning an insider. [4]

Section 727(a)(7) extends the basis for denial of discharge to the debtor's misconduct in a substantially contemporaneous related bankruptcy case. See Collier on Bankruptcy, ¶ 727.10 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.; In re Leija, 270 B.R. 497, 500 (Bankr. E.D. Cal. 2001). Thus, if the debtor engages in objectionable conduct in a case involving . . . a corporation of which the debtor is an officer, director or controlling person, the debtor may be denied a discharge in that debtor's own case. Id. This provision is intended to induce the cooperation of individuals in related bankruptcy cases. In re Krehl, 86 F.3d 737, 741 (7th Cir. 1996); In re Miller, 448 B.R. 551, 570 (Bankr. N.D. Okla. 2011) (§727(a)(7) broadens the reach of discharge exceptions to encompass actions of insiders).

**e)   § 727(a)(2) - Fraudulent Transfer or Concealment of Property:**

Under § 727(a)(2), the court may deny the debtor a discharge, where the debtor, with

---

[3] As of the date the order for relief was entered in the event of an involuntary.
[4] "Insider" is defined in § 101. If the debtor is an individual, the term includes relatives of the debtor, partnerships in which the debtor is a general partner, a general partner of the debtor and corporations of which the debtor is a director, officer or person in control. See Collier on Bankruptcy ¶ 727.10 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)

intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed either property of the debtor, within one year before the date of the filing of the petition; or property of the estate, after the date of the filing of the petition.

A party seeking denial of discharge under 11 U.S.C.S. § 727(a)(2) must prove two things: (1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property. Retz v. Samson (In re Retz), 606 F.3d 1189, 1193 (9th Cir. 2010).

## IV.    FINDINGS OF FACT AND CONCLUSIONS OF LAW[5]

### A.    **Documents, Books and Records**

A debtor has the affirmative duty to surrender all estate property and records to the chapter 7 trustee. See 11 U.S.C. § 521(a)(4). This duty is non-negotiable. See generally Brower v. Evans, 257 F.3d 1058, 1068 n. 10 (9th Cir.2001) ("Shall means shall.") Section 521(a)(3) also requires that a debtor "cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties...." Federal Rule of Bankruptcy Procedure 4002(a)(4) underlines those responsibilities by requiring that debtors "cooperate with the trustee in ... the administration of the estate." In re Starky, 522 B.R. 220, 227 (B.A.P. 9th Cir. 2014). "Creditors are not required to risk the withholding or concealment of assets by the [debtor] under cover of a chaotic or incomplete set of books or records." In re Cox, 904 F.2d 1399, 1401 (9th Cir. 1990), citing Burchett v. Myers, 202 F.2d 920, 926 (9th Cir.1953). "Concealment" of records is not confined to physical secretion. It covers other conduct, such as withholding knowledge of assets by failure or refusal to divulge owed information. See Collier on Bankruptcy, ¶ 727.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed). As discussed below, Lopez concealed and withheld documents and financial records in both the LDT and her personal bankruptcy cases under these standards.

### 1.    LDT Records

The order for relief in the LDT case was entered on December 8, 2011.  It ordered debtor LDT to file a list containing the name and address of each entity included on Schedule D, E, F, G, and H; LDT was also ordered to file schedules, a SOFA and a verified Statement of Social Security Number(s) (Official Form B21) referred to in Federal Rule of Bankruptcy Procedure 1007(a), (c) and (f) within 14 days after entry of the Order For Relief. See LDT Bankr. ECF No. 11. The Trustee then held a §341(a) meeting of creditors on January 23, 2012 and had to continue it to February 21, 2012, because there were still no LDT schedules and no appearance by LDT. See LDT Bankr. ECF No. 31. Lopez had already invoked her Fifth Amendment privilege not to testify on September 22, 2011, and October 26, 2011, in response to many questions in her personal case that related to LDT assets and records. The 341(a) meeting was concluded on February 21, 2012, and still no items required under F.R.B.P. 1007 had been filed on behalf of LDT and no one appeared on behalf of LDT.

---

[5]  The findings of fact and legal conclusions herein constitute the court's findings under *Federal Rule of Civil Procedure 52(a)*, applicable in this bankruptcy proceeding under *Federal Rule of Bankruptcy Procedure 9014*.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

Lopez allowed all of LDT's computers with all of its digital records to be sold at a garage sale.  The garage sale occurred pre-petition before either the Lopez or the LDT bankruptcies were filed.  Lopez testified that LDT stopped operating in April 2011. After LDT was evicted from its business location, Lopez let LDT's furnishings go and did not keep the computers. See Three Day Notice to Vacate, Defendant Ex. 12 at 427 dated May 10, 2011. Lopez claimed she had paper copies of all the documents and there was no reason for her to preserve the computers. Under the circumstances, liquidating the computers at a garage sale without proof of any knowledge of a potential future involuntary bankruptcy is not a basis for denial of discharge. Because LDT's electronic records were lost, the Trustee had a greater need for the hard copies of any records to be provided clearly and quickly so the missing information could possibly be reconstructed from the records that were kept.

Although Lopez eventually provided significant amounts of records of LDT, she did so in a manner designed to slow the Trustee down and thwart any real understanding of her personal and LDT's corporate finances. Despite multiple demands by the Trustee and Court orders, the Trustee never obtained schedules for LDT or a coherent explanation of the business.  Lopez only started turning over documents after the Trustee filed a complaint objecting to her discharge. Lopez then gradually provided documents over a 12-month period, and did organize some of them into specific groups such as a box of foreclosed properties, closed transactions, short sale negotiations, and "cash for keys" properties. She did list the addresses of each set of property records as they were turned over.  Many of the records, however, were not organized in any fashion and there was no way to tell whether the provided documents included the full universe. The Trustee employed accountants to attempt to figure out LDT's financial condition, but after hundreds of hours, the accountants were not able to link up documents to determine a coherent view of LDT's financial transactions. The trustee needs to link an individual's finances with those of a corporation and to follow any business transaction to see what can be recovered for the estate and what claims of creditors are proper. See, e.g. In re Cox, 904 F.2d 1399, 1402 (9th Cir. 1990) (denial of discharge where trustee found no ledgers or books of account for the debtor's individually or for their major corporation which made it impossible to ascertain financial position or follow business transactions with any assurance of accuracy.)

Lopez's accounting expert CPA Avila testified that she was hired by Lopez to review and analyze LDT's financial information. Avila stated that over a two day period, she reviewed thousands of LDT documents and with the assistance of Lopez, was able to discern LDT's finances. Avila stated that her report offered no opinion on the sufficiency of Lopez's records personally, but the review of LDT financials did include some of Lopez's personal records.

John Menchaca ("Menchaca") was the Trustee's accounting rebuttal expert and was hired by the Trustee solely to analyze Avila's report. Menchaca testified that Avila's report did not provide enough of a basis to conclude what it concludes. Menchaca was convincing that what Avila reviewed did not support the opinions she expressed in her expert report.

    2.  Personal Records

Avila did not support Lopez's argument that the records she turned over were adequate. Avila provided no opinion on the sufficiency of records for Lopez personally. Although Lopez admitted to significant gambling losses and self-employment income over $300,000 in certain

years, the source of either LDT or other funds for this was never clearly explained. Menchaca testified that his review of the gambling records were that Lopez had $2.5 million in gambling winnings in various Las Vegas casinos, but losses of $1.6 million. As she only claimed $315,000 in income at that time, there was more to explain as to how she generated those winnings. As a CPA, Menchaca did not see how anyone could opine as to Lopez's personal finances or LDTs assets without looking at a larger universe of bank records to explain such things.

Lopez also made it extremely difficult for the Trustee to ascertain her personal financial condition or material business transactions for over two years during her personal bankruptcy case because she never produced any personal financial information such as bank statements or canceled checks, and other information normally relied upon by a Chapter 7 Trustee to investigate and understand a debtor's financial condition. The documents Lopez produced to the Trustee regarding her financial information were mainly her tax returns, and they were not turned over to the Trustee until after he had concluded the §341(a) Meeting. Lopez's individual tax returns were then grossly inaccurate and insufficient to determine her financial condition as the testimony of Menchaca showed. Lopez was willing and able to explain sufficient personal financial information for the IRS to lower her tax liability through LDT, but did not make that effort for the Trustee. See IRS report dated May 16, 2014, Defendant Ex. 31.

3. Justification

The Court must consider that the records and information needed to be gathered from a company that had been quickly shut down and evicted from its business premises and that Lopez did not have a staff to assist her. Even considering those circumstances, Lopez's actions were not justified. Although, Lopez was forced into an involuntary bankruptcy, she did not oppose the entry of the order for relief in either her personal or LDT's case. Her failure to bring any coherent explanation to the documents is only explained in part by the prepetition sale of the computers. Although Lopez did not graduate high school, she was still quite experienced in real estate sales and was intelligent and sophisticated enough to start and run a business. Lopez began her career at age twenty one as a receptionist and worked her way up to sales, then became a title representative and eventually an Escrow Officer. As LDT's sole shareholder, she was extensively involved in the business and was required by law to maintain books and records for LDT, particularly for tax purposes. Through all of these positions, she appears to have been aware of the need to document and maintain records in order to run the business. She also demonstrated that she had the capacity to track specific transactions through complex LDT records as part of running the company pre-petition and in the report she prepared for the IRS and introduced as defendants Exhibit 31.

In her testimony at trial, Lopez stated that she relied on other people's expertise in accounting and bookkeeping and figured the Trustee would put it all together with his accountants. Although Lopez is correct that the Trustee has the affirmative duty to investigate the financial affairs of the debtor, the "information about a debtor's assets, of necessity, must come primarily if not entirely from the debtor. The trustee cannot conjure it out of thin air." Starky v. Birdsell, 522 B.R. 220, 227 (9th Cir BAP 2014). She avoided explaining why she did not attempt to explain the records in more detail to the extent she could without her accountant, and instead kept launching into a discussion of how she lost her investment and it is inequitable for the Trustee to have any money belonging to LDT when she is broke. Even if her claim were

correct that she put more into the company than she took out, she never pointed to records of the operations or finances of LDT in a way that the Trustee could have figured out the total assets or liabilities to the benefit of all creditors, including potentially herself.

Lopez also hindered the Trustee from filing avoidance actions. The passage of time—without more—erodes the Trustee's potential use of his avoidance and asset recovery powers. Most generally, those powers are limited in 11 U.S.C. § 546; an action or proceeding under §§ 544, 545, 547, 548 and 552 "may not be commenced" (under the circumstances of this Chapter 7 case) after two years from the petition date. In re Boyajian, 486 B.R. 306, 322-23 (Bankr. D.N.J. 2013). The orders for relief entered on July 28, 2011 and December 8, 2011 for the Lopez and LDT bankruptcies respectively, started the running of the § 546 period of limitation, which expired shortly after Lopez waived her Fifth Amendment privilege. The mass production of nearly 75,000 pages that took almost a year to deliver to the Trustee could only have been analyzed thereafter by the Trustee over a reasonable period of time in order to determine whether avoidance actions were warranted. In an effort to not miss any deadlines, however, the Trustee filed hundreds of adversary proceedings in the LDT bankruptcy. With insufficient LDT records, the Trustee testified it was hard to find and serve defendants. When the Trustee found and properly served the defendants, they had evidence to support the disbursement and the Trustee lacked evidence to pursue the case further, so the Trustee had to dismiss a majority of those actions.

Lopez's extreme delay in turning over documents to the Trustee coupled with her assertion of the Fifth Amendment privilege grossly impeded the Trustee's ability to administer her personal case in an efficient manner. The lack of schedules and a SOFA in the LDT case further compounded this, resulting in Lopez withholding information and concealing LDT's financial condition.

## B. Failure To Explain Losses/ Concealment of Assets

The complaint alleges that there is an inadequate explanation of a loss of assets in both the personal and LDT cases. As discussed earlier, the Trustee has the initial burden to show the debtor owned identifiable assets, and that the debtor has failed to explain the loss of those assets in the bankruptcy. The burden then shifts to the debtor to explain the loss of assets. A debtor's failure to offer a satisfactory explanation when called on is a sufficient ground for denial of discharge. In re Retz, 606 F.3d 1189 (9th Cir. 2010).

The Trustee alleged in his complaint that Lopez's individual income for the two years prior to the petition date was in excess of $300,000, but her statements and schedules filed in this case do not sufficiently account for the disparity between her previous substantial income and the value of her scheduled assets. Lopez testified that any gambling income she received she then invested into LDT. Lopez did not provide complete enough LDT records to corroborate her explanation. She did show, however, that she was able to convince the IRS that she put more money into LDT than they originally believed. She also provided records of money put into LDT, although Lopez was evasive during the trial as to exactly what she put into LDT from personal income as opposed to funds received previously from LDT.

The evidence at trial showed that Lopez freely used LDT funds for her own personal benefit, i.e., in extensive gambling, paying for personal expenses such as her BMW, and paying

for tickets to expensive sporting events. See Trustee Exhibits 32 and 33. Lopez's testimony combined with the exhibits at trial of her expenditures and funds returned to LDT actually showed that Lopez was unlikely to have had any assets in her personal estate at the time she filed. The evidence showed that she did not adequately distinguish between her own income, the income of family members who worked for LDT, and income of LDT. She spent fairly wildly when things were going well without regard to what was hers or the corporation's and failed to maintain sufficient cash reserves to pay LDT's rent or storage costs. She counted on a regular influx of distressed properties and rents to keep the operation afloat and lost her personal cash flow when LDT was ordered to cease and desist. The only conclusion that can be drawn from the totality of the evidence is that Lopez personally had little at the time the order for relief was entered as any assets belonged to LDT. Lopez's testimony that the sudden closure of LDT left her "broke" was credible and consistent with the way she operated the company. Oddly, this adequately explained Lopez's loss of personal income and assets post-petition since she appears to have counted on LDT's continuing cash flow to keep her lifestyle afloat. There was insufficient evidence shown to prove any violation of §727(a)(5) in Lopez's personal bankruptcy.

Conversely, there was no explanation of what happened with LDT's assets and properties. There is no question that LDT still had properties at the point when the order for relief was entered. Lopez herself alleges there was equity in some of the properties and seemed to think there was money to be made collecting rent on some of them. LDT handled approximately 180 properties in some capacity during its existence, although it is unclear how many were for rent collection, for "flipping" into profits or for purposes of negotiating a "short sale." The Court has held hearings and granted relief from stay orders on over 25 different properties, and it appeared there was no equity in them. Without the proper records, however, the Trustee could not ascertain LDT's financial condition and Lopez, as LDT's sole shareholder, failed to explain satisfactorily any loss of assets or deficiency of assets to meet LDT's liabilities. Although Lopez eventually turned over LDT documents to the Trustee, provision of voluminous financial documents is no defense where they still do not explain the assets and liabilities of an estate. In re Hazelrigg, No. Adv. 12-01966-TWD, 2013 WL 6154102, at *7 (B.A.P. 9th Cir. Nov. 19, 2013).

Lopez submitted the expert report of CPA Avila and asserted the assets of LDT could be ascertained from the records she turned over. Neither Lopez nor Avila provided any explanation of how these documents explained the transfers or disposition of all or some of the properties and rents. Avila's opinion as to the sufficiency of LDT records was too vague as she did not quantify the time period her examination applied to. Although she opined that there was no unexplained loss of assets, she never stated what assets she referred to – cash or property and as of which beginning and ending date. Without beginning cash inflows and outflows between 2007 and 2011, there was no basis for concluding that there had been no loss of cash assets of LDT. Avila's opinion seemed concerned mainly with showing that Lopez put lots more money into LDT than she ever took out, but it did not explain what happened to the assets of LDT, regardless of where they came from.

Lopez argued that LDT had properties, and if the Trustee had only allowed her to sell them, she could have turned the company around and paid everyone. She believes placing her into involuntary bankruptcy is what brought ruin on everyone. Although there is no evidence that anyone could have continued to operate LDT in a legally permissible manner, if it were possible,

she never provided this information on how to bring so much revenue into the LDT estate. The evidence showed that Lopez failed to explain what actually happened to LDT's assets and properties after the Trustee demonstrated that there were significant assets of LDT pre-petition. Thus, she is not entitled to a discharge under §727(a)(5) as applied through §727(a)(7).

The Trustee has also alleged a transfer or concealment of LDT assets under §727(a)(2). This allegation seems to be that Lopez collected rents from property belonging to the estate. The Court has previously made undisputed factual findings in its 2013 Memo of Decision as follows:

- Lopez recalls unlawful detainer proceedings having been commenced by LDT as late as 2012. Lopez admits having authorized those suits. See Trustee Ex. 7 at 2:5–9; see also Trustee Exhibits 36–53.
- In 2012, Lopez, on behalf of LDT, retained Express Evictions. Retainer agreements were entered into by Lopez on behalf of LDT. In order to commence the unlawful detainer actions, Lopez also had "3-Day Notice to Pay Rent or Quit" notices posted on certain properties. The notice instructed tenants to pay rent to Precious Gems Management, a management company owned by Celeste Lopez, a relative of Diane Lopez. See Trustee Exhibits 34, 35, 41, 45, 47, 49 & 50.
- Lopez also authorized an August 6, 2010 grant deed to be recorded on May 17, 2012. See Trustee Ex. 7 at 2:10–16. This transaction also took place after the Order for Relief and, importantly, after the Trustee concluded the 341(a) meeting of creditors on February 21, 2012 (LDT Bankr. Doc. No. 46), and after Debtor Lopez produced some documents to the Trustee. PTO Undisputed Facts ¶¶ 23–26.
- There is no dispute that Lopez authorized Precious Gems Management to collect rent. See Trustee Ex. 7 at 5:23–24.

The evidence showed that there was an attempt to collect rents from properties belonging to LDT, but it is unclear whether Lopez or her family members actually collected any rent or took possession of any LDT properties. This evidence is probative of other issues, but there was insufficient evidence of a successful violation of §727(a)(2).

## C. LDT/Lopez Status

As of the petition date of her personal bankruptcy, Lopez was the 100% shareholder, Chief Executive Officer and sole corporate officer of LDT. See Pretrial Stipulation and Order, Adv. ECF No. 91 at ¶ 8. As such, she is considered an insider of LDT under 11 U.S.C. §101(31)(A)(iv), and LDT is an insider of debtor Lopez under §101(31)(B)(iii). Lopez has argued that she could not take any actions on behalf of LDT because LDT was a suspended corporation. That fact, however, does not excuse Lopez from filing schedules or turning over LDT's book and records. The Court already ruled that LDT's defunct status did not excuse its compliance with §521. See Trustee Ex. 7 at 4:9. The Court explained in its 2013 Memo of Decision that although LDT may generally not continue to conduct business, this Court still has jurisdiction over LDT in order to wind up its affairs under California law. The Court required LDT to submit the information necessary to wind up its business and administer the estate for the benefit of the creditors. Reed v. Norman, 48 Cal. 2d 338, 343 (Cal. 1957); Weinstock v. Sinatra, 379 F. Supp. 274, 277 (C.D. Cal. 197). Regardless of whether a Corporation is suspended, it is still required to comply with the Bankruptcy Code, which LDT failed to do so. Lopez was the only individual who could have caused LDT's compliance with court orders.

1

2      This excuse of "suspended status" for not assisting the Trustee with basic information
necessary for winding up a corporation is also not credible in light of other actions taken by

3      Lopez. While the Trustee was attempting to obtain basic information about LDT, Lopez was
attempting to gather whatever remaining funds she could out of the failed LDT real estate

4      business. Although Lopez maintained that she was not able to act on behalf of LDT, she
nevertheless authorized LDT to continue to pursue unlawful detainer proceedings <u>after</u> the LDT

5      and Lopez orders for relief were entered.

6      On June 26, 2013, Lopez also filed a motion, which was granted, requesting authorization

7      to speak to the IRS and California Franchise Tax Board about LDT's pre-petition tax liability on
the basis that any tax assessed against LDT would flow through to Lopez personally because of

8      LDT's "S corporation" status. <u>See</u> LDT Bankr. ECF Doc. 198. Notably, where her personal
liability was at issue, Lopez found a way to provide information about LDT. Where assistance to

9      the Trustee was required in the LDT case, she took the position that she could not do anything
despite her status as LDT's sole officer and shareholder.

10

11     Notably, this failure to assist the Trustee in understanding even what real property
belonged to LDT and what the liabilities were occurred at the same time there were over twenty

12     five relief from stay motions filed in the LDT case. The Trustee had limited opportunity and
very little information to respond to motions that, theoretically, were critical to the question of

13     what return creditors would receive in the case. During the course of the LDT case, there have
been over 500 docket entries, indicating the complexity of its administration and the need for

14     information to wrap up its affairs.

15
       ### D. <u>Fifth Amendment Privilege Against Self Incrimination</u>
16

17     Lopez correctly argues she cannot be denied a discharge for previously invoking her Fifth
Amendment privilege against self-incrimination. The Bankruptcy Code contemplates that the

18     Fifth Amendment privilege can be invoked in bankruptcy cases and adversary proceedings. 11
U.S.C.S. § 344; 11 U.S.C.S. § 727(a)(6). Proper invocation of the privilege against self-

19     incrimination is not a basis for denial of discharge in and of itself. 11 U.S.C. § 727(a)(6)(B) and
(C). Exercising her privilege against self-incrimination did not excuse Lopez from cooperating

20     with the Trustee and does not protect Lopez from being denied a discharge. <u>See</u> In re Ciotti, 442
B.R. 412 (Bankr. W.D. Pa. 2011), subsequent determination, 448 B.R. 694, 65 Collier Bankr.

21     Cas. 2d (MB) 671 (Bankr. W.D. Pa. 2011) (when debtor refuses to answer questions at trial,
citing a Fifth Amendment privilege, debtor could be denied discharge because assertion of the

22     privilege precludes the fair and effective administration of the bankruptcy estate); <u>In re Connelly</u>,
59 B.R. 421, 14 Bankr. Ct. Dec. (CRR) 274 (Bankr. N.D. Ill. 1986) (invoking Fifth Amendment

23     does not excuse debtor from performing duties under Bankruptcy Code).

24

25     The trier of fact is also free to draw adverse inferences from a failure of proof arising out
of the assertion of the privilege. <u>In re Nat'l Audit Def. Network</u>, 367 B.R. 207 (Bankr. D. Nev.

26     2007) (Although civil litigants may invoke the privilege against self-incrimination, the court is
empowered to do more than simply draw adverse inferences; in appropriate cases it may strike

27     pleadings, bar evidence, and even rule against a party based upon that party's refusal to testify).
In certain circumstances, a negative inference arises from a defendant's failure to produce

28     documents that should have been in his possession. The inference is that the documents would

have been damaging to the defendant. This adverse inference rule is applicable when: (1) it appears that the documentary evidence exists or existed; (2) the suppressing party has possession or control of the evidence; (3) the evidence is available to the suppressing party, but not to the party seeking production; (4) it appears that there has been actual suppression or withholding of evidence. Id. Whether an adverse inference should be drawn depends upon the facts of the case. Nationwide Life Ins. Co. v. Richards, 541 F.3d 903, 910 (9th Cir. 2008).

No adverse inference may be drawn, however, unless there is a substantial need for the information and there is not a less burdensome way of obtaining that information. In re Martinez, 500 B.R. 608 (Bankr. N.D. Cal. 2013). The court must also determine whether the value of presenting the evidence is substantially outweighed by the danger of unfair prejudice to the party asserting the privilege. Id. Full, complete and timely schedules and SOFA's are designed to provide the critical information needed at the beginning of any bankruptcy case. "Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." In re Tabibian, 289 F.2d 793,797 (2d Cir. 1961).

Although Lopez properly invoked her privilege against self-incrimination, adverse inferences may fairly be made. Lopez was in possession of information and documents that were not available to the Trustee for a critical phase of the case. Clear explanations through full and timely schedules and assistance with understanding the financial circumstances of either her personal estate or the LDT estate were never provided. The Trustee had a substantial need for the information in both the Lopez and LDT bankruptcies. There was no less burdensome way of obtaining that information; the Trustee attempted to gather it at great expense to the estate by hiring an accountant, but still was unable to get a clear picture. LDT's computers were sold in a garage sale, and Lopez was the only person with any paper records of her personal and LDT's finances.

Lopez also argues that since she eventually turned over documents to the Trustee and withdrew her assertion of her Fifth Amendment privilege, the Trustee's claim is moot. Putting aside whether Lopez's late provision of information was of any use, Lopez's alleged eventual cooperation with the Trustee in this case did not erase the damage already done to the estate's creditors. Here, Lopez did not waive her privilege in her personal bankruptcy schedules until long after entry of the Order for Relief. Significantly, she timed the letter explaining that she was no longer asserting her Fifth Amendment privilege so that it arrived right after the Trustee had concluded the 341(a) examination. Her assertion of the privilege shut down the Trustee's ability to obtain necessary information required in the first year of the case when assets are marshaled, avoidance actions and other causes of action are investigated and claims are analyzed. The Trustee testified that Lopez's assertion of her privilege kept him from exploring and fulfilling his duties as a chapter 7 Trustee because he did not have any of her personal financial information and an insufficient understanding of LDT's finances.

Lopez's invocation of the Fifth Amendment also cannot be viewed in isolation. It was combined with a whole host of other actions or failures to act that harmed the Lopez and LDT estates. Lopez also failed to file LDT schedules, allowed valuable computer records to be sold at a garage sale pre-petition, sought to secretly continue some of LDT's business, delayed inexcusably in providing remaining records to the Trustee and provided little meaningful or helpful testimony when she was finally examined under oath.

### E. **State of Mind/Intent**

Various subsections of § 727(a) require a specific state of mind. Violations of subsection (a)(2) require "an intent to hinder, delay, or defraud a creditor or officer of the estate." A debtor's intent need not be fraudulent to deny a discharge for concealment of assets; it is sufficient if the debtor's intent is to hinder or delay a creditor. In re Retz, 606 F.3d 1189 (9th Cir. 2010). In determining whether a debtor has acted with intent to defraud, the debtor's "whole pattern of conduct" should be considered. In re Sever, 438 B.R. 612, 620 (Bankr. C.D. Ill. 2010).

The "knowing and fraudulent" intent standard of § 727(a)(4) means that Debtor Lopez must have actual (not constructive) intent in concealing records or making an omission in schedules. In re Wills, 243 B.R. 58, 64 (9th Cir. BAP 1999). Fraudulent intent may be proved by circumstantial evidence, and reckless disregard combined with other circumstances may support an inference of fraudulent intent. Matter of Sholdra, 249 F.3d 380, 382 (5th Cir. 2001); In re Khalil, 379 B.R. 163, 174 (9th Cir. BAP 2007); Retz, 606 F.3d at 1199; Stamat v. Neary, 635 F.3d 974, 982 (7th Cir. 2011) (reckless disregard shown where debtors who failed to disclose business interests were highly educated and had significant business experience). Intent can be established by consideration of the totality of circumstances. In re Devers, 759 F.2d 751, 753–54 (9th Cir. 1985). The necessary intent under § 727(a)(2) "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." In re Adeeb, 787 F.2d 1339, 1343 (9th Cir.1986) (quoting Devers, 759 F.2d at 753–54)).

Sections 727(a)(3) and (5) do not have an intent or state of mind requirement. Denial of discharge under these provisions only requires the debtor to act. In re Scott, 172 F.3d 959, 969 (7th Cir. 1999); Cox, 904 F.2d at 1401 (quoting Burchett v. Myers, 202 F.2d 920, 926 (9th Cir.1953)).

Intent can be inferred because Lopez had the ability and willingness to work with others to reconstruct records or find information when it benefited her, as she did with the IRS and CPA Avila, but failed to do with the Trustee. Facing a significant tax liability, she found a way to assist the IRS find and put together the financial information they needed to determine her tax liability. See IRS report dated May 16, 2014, Defendant Ex. 31. The IRS claim was originally $3 million but with the help of Lopez, the liability decreased significantly to $178,858.65. See Amended Proof of Claims # 6-4 and 6-5, Lopez Bankr. Lopez's fraudulent intent can also be inferred based on the timing of Debtor's final waiver of the Fifth Amendment privilege and lack of filing of LDT bankruptcy schedules. Lopez waived the Fifth Amendment privilege for her schedules and SOFA three months after the Court ordered her cooperation with the Trustee in connection with the LDT Bankruptcy Case and twenty one months after the order for relief in her personal case.

The Court has considered Lopez's defenses carefully and listened closely to her testimony and argument at all pretrial hearings and trial. She is clearly a hard worker, a single mother with seven children who has struggled to advance herself with little to no formal education. Her efforts throughout the pretrial discussions and trial appeared to consistently be intended to prove that she had invested more in LDT than ever was returned to her and that the investors who filed the involuntary bankruptcies were the ones who were at fault. Although the Court continually continued hearings and sought to get her to focus on the specific issues the Trustee alleged in the discharge action, and provided a clear explanation of the applicable law in

numerous memoranda before trial, she did not appear to ever address the need for the Trustee and creditors to have a better explanation of her personal and LDT's financial matters. Her testimony was also not completely credible at trial, and she sometimes became evasive whenever pressed to answer a specific question she did not wish to answer on cross examination.

Based on the correspondence between the Trustee and debtor's former counsel, the Court sought to discern whether Lopez was relying on advice of counsel or was possibly just confused or misguided. While her actions delaying turnover of records violated §727(a)(3) regardless of whether she had a fraudulent intent, the Court has concluded that any fair reading of her activities, trial testimony and demeanor shows that she also possessed a knowing and fraudulent intent and did indeed seek to hinder and delay the Trustee. Lopez never stated at any point that she took the actions she did in obstructing any reasonable administration of this estate solely because of advice of counsel or because she thought she was somehow helping the Trustee or creditors. She also very definitely made choices to ignore clear court orders that were served on her individually.

Based on her testimony at her 2004 examination (Trustee Ex. 55), and her trial testimony, Lopez appears to have relied on various professionals throughout the operation of LDT and the two bankruptcy proceedings to take care of all tax, accounting and legal matters. She seemed to blame most of the failures in properly paying taxes, sending items to regulatory agencies, accounting for transactions and explaining the finances to the Trustee on these professionals. She consistently followed these professionals' advice, however, where it was to her immediate benefit. She operated before and after the bankruptcy with an attitude that was reckless about any personal responsibility as an officer of a company and then a debtor and principle of a corporate debtor. She freely admitted gambling extensively with LDT's money (Trustee Ex. 55 at SDL0051-59), then argued that it was all her money when she "invested" it in LDT. She frequently avoided answering questions directly or claimed a lack of memory. Every document and answer was pulled out of her after extensive time and expense to the estate.

Lopez chose to attempt to continue running the LDT business after the order for relief was entered because she stubbornly believed that the creditors who filed the involuntary bankruptcy had wronged her. She knew she needed to be deceptive in doing so because she switched payments over to "Precious Gems," her daughter's company, instead of LDT. Although she may not have a finance or business degree, she chose what to learn about financial or business matters and where to claim a lack of sophistication or fail to listen to simple instructions. She operated an extensive real estate investment operation involving 180 properties after working as an escrow officer and learning how to acquire property. She had the talent to obtain these distressed properties from lenders and homeowners and knew enough to keep a "cash for keys" operation going for years. Such a business entailed significant paperwork, coordination, record keeping, regulatory compliance, accounting and legal work. This demonstrates an ability to fill out information on schedules and the statement of affairs and to answer questions posed by the Trustee in a helpful manner, but that was never proffered.

Lopez may well have had a factual and lawful basis to rely on her right not to testify. It is important to remember, however, that a debtor's choice to protect her own personal interests can also be a choice to harm the interests of the estate, especially when combined with other activities taken in these two bankruptcy cases. Being a debtor or a principle of a debtor in a bankruptcy proceeding is generally not a pleasant process. The trade-off for cooperation and

honesty in this process is the discharge of debts.

### V.    CONCLUSION

Thus, based on the facts stated above, Lopez is denied her discharge under §§727(a)(3), and (a)(4)(D) as a result of actions in her personal bankruptcy.  With respect to the LDT bankruptcy, her discharge is denied under §727(a)(3), (a)(4)(D) and (a)(5) as applied through §727(a)(7).  As explained above, the Trustee has not met his burden of proof as to §727(a)(5) in the personal bankruptcy and §727(a)(2) in the LDT bankruptcy.  The Trustee shall submit an order and judgment consistent with this ruling.

###

Date: June 19, 2015

_Maureen A. Tighe_
Maureen A. Tighe
United States Bankruptcy Judge